**DEGUSSA CORPORATION, Pigment Division, North America Silica Company, and P.Q. Corporation, Appellants (Defendant below),**

v.

**Lenita MULLENS, Appellee (Plaintiff below).**

**Agritek Bio Ingredients, Inc., Appellant (Defendants below),**

v.

**Lenita Mullens, Appellee (Plaintiff below).**

No. 49S05–9812–CV–763.

Supreme Court of Indiana.

March 16, 2001.

Cory Brundage, Ice, Miller, Donadio & Ryan, Indianapolis, for Appellants Degussa Corporation, Pigment Division, North American Silica Company, and P.Q. Corporation.

Richard R. McDowell, Hill, Fulwider, McDowell, Funk & Matthews, Indianapolis, for Appellant American Laboratories, Inc.

Dale W. Eikenberry, Wooden, McLaughlin, Indianapolis, for Appellant Agritek Bio Ingredients, Inc.

James M. Hinshaw, David O. Tittle, Bingham, Summers, Welsh & Spilman, Indianapolis, for Appellant Henwood Feed Additives.

Richard J. Dick, Mitchell, Hurst, Jacobs & Dick, Indianapolis, for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

Lenita Mullens filed a complaint against Defendants for negligently exposing her to products which allegedly caused her to suffer permanent lung damage. Defendants moved for summary judgment asserting that Mullens filed her complaint after the expiration of the two-year statute of limitations for her products liability claim. Finding that Mullens filed a timely claim, we affirm the trial court's denial of

Defendants' summary judgment motion. Defendant Agritek filed a separate motion to dismiss, asserting that the Indiana Worker's Compensation Act precluded Agritek's liability in tort to Mullens. The members of this court participating in this case are evenly divided on this issue and so the trial court's denial of Agritek's motion to dismiss is affirmed.

*Background*

On September 4, 1990, Lenita Mullens began work for Grow Mix, a company formed by Richard Martin and Agritek Bio Ingredients, Inc. (Agritek), to produce feed additive products for Agritek.[1] Mullens oversaw the production of Agritek products for Grow Mix and one of her primary responsibilities included the physical mixing of liquid and dry ingredients to make animal feeds. The mixing process generated a great deal of dust.

Mullens initially wore paper masks to protect herself from the dust, but found them to be inadequate and began to use a respirator. Three to four months into her job, Mullens experienced a persistent cough that would diminish after she went home from work and on weekends. In March, 1991, Mullens sought emergency room treatment for bronchitis, a condition for which she had received medical care prior to her employment with Grow Mix. The bronchitis went away, but the cough continued.

On February 4, 1992, Mullens experienced severe coughing and shortness of breath at work. She went to the emergency room again, was told that she had bronchitis, and received a prescription for antibiotics. This time the antibiotics did not work, so Mullens scheduled an appointment with her general physician, Dr. Kenneth Watkins. On March 17, 1992, Dr. Watkins diagnosed Mullens with bronchitis. Dr. Watkins told Mullens that it was possible that her coughing and breathing problems were work-related, but that there were several other potential causes. If Mullens's problems were work-related, the doctor was unsure whether the problems were caused or merely aggravated by the conditions at work. On March 23, 1992, Dr. Watkins advised Mullens not to work for a minimum of two weeks and referred her to a pulmonary specialist for follow-up tests and to further investigate the source of her ailments.

On March 26, 1992, the specialist, Dr. Reihman, told Mullens that it was possible that work-related chemical exposure only was triggering an injury caused by something else. Dr. Dana Reihman advised Mullens to undergo some tests. On June 11, 1992, Dr. Reihman made the following observation: "The etiology of Mrs. Mullens['s] chronic airflow obstruction and its relationship to her work environment remains unclear." In April, 1992, when Mullens was working with Dr. Reihman to identify the cause of her ailments, Degussa Corporation[2] representatives visited her at work and told her that their product could not be causing her medical problems.

Dr. Reihman was ultimately unable to determine the cause of Mullens's problems and referred her to Dr. Joe Garcia, a pulmonary specialist, for further evaluation. At Mullens's first visit with Dr. Garcia in June, 1992, Dr. Garcia repeated Drs. Watkins's and Reihman's assessments, telling Mullens that chemical exposure at work might be related to her ailments but that other causes were possible. Dr. Garcia treated Mullens and attempted to diagnose her problems from June, 1992 until March, 1994, when Mullens and her attor-

---

1. There is some dispute in the record as to whether Mullens was employed by Grow Mix or Gro–Tec, two separately created companies housed in the same building in Modoc, Indiana. Martin is the president of Gro–Tec. Mullens asserts that she received her pay checks from Gro–Tec. For purposes of the issues before us on appeal, we need not decide Mullens's employment status as it relates to Grow Mix and Gro–Tec.

2. Degussa produced Sipernat 22, one of the ingredients used in making the feeds.

ney received the first unequivocal statement from any doctor that her lung disease was caused by exposure to chemicals consistent with those used at Grow Mix.

On March 25, 1994, Mullens filed a complaint against Degussa Corporation, Pigment Division, North America Silica Company, P.Q. Corporation, and Agritek Bio Ingredients, Inc. (collectively, "Defendants"), alleging negligence in the sale of, and her exposure to, products that caused lung damage.[3] Defendants joined in a motion for summary judgment arguing that Mullens did not assert her claims within the two-year statute of limitations for products liability actions. Defendant Agritek also filed a motion to dismiss Mullens's tort claims against it, asserting that because Agritek was her employer, the Indiana Worker's Compensation Act provided her exclusive remedies for work-related injuries on the job. On May 1, 1997, the trial court denied Defendants' motion for summary judgment. On May 8, 1997, the trial court denied Agritek's motion to dismiss. Defendants appealed to the Court of Appeals. The Court of Appeals concluded that Mullens failed to file her claims within the statute of limitations period and reversed the trial court, thereby granting Defendants' motion for summary judgment and rendering moot Agritek's separate appeal on their motion to dismiss. *Degussa Corp. v. Mullens,* 695 N.E.2d 172, 178 (Ind.Ct.App.1998).

Additional facts will be provided as needed.

*Discussion*

**I**

■■■ Ind.Code § 33–1–1.5–5 (1993) is the limitations statute that governs Mullens's action based on negligence and products liability theories.[4] It states that "any product liability action in which the theory

of liability is negligence or strict liability in tort ... must be commenced within two (2) years after the cause of action accrues..." Ind.Code § 33–1–1.5–5. The statute is silent as to the meaning of "accrues." However, we have adopted a discovery rule through case law for the accrual of claims arising out of injuries allegedly caused by exposure to a foreign substance. The two-year statute of limitations begins "to run from the date the plaintiff knew or should have discovered that she suffered an injury or impingement, and that it was caused by the product or act of another." *Barnes v. A.H. Robins Co.,* 476 N.E.2d 84, 87–88 (Ind.1985); *See also Wehling v. Citizens Nat'l Bank,* 586 N.E.2d 840, 842–43 (Ind. 1992) (extending the discovery rule rationale of *Barnes* to all tort claims).

Defendants contend that the statute of limitations started to run when Dr. Watkins examined Mullens on March 17, 1992, and suggested that exposure to chemicals at work was one of a number of possible causes of her problems. Therefore, when Mullens filed her claim on March 25, 1994, it was eight days late. Mullens responds that the statute of limitations did not begin to run until sometime after March 25, 1992, if not as late as March 1994 when she received the first diagnosis from a physician that her lung disease was caused by exposure to chemicals at work.

While the present case is one based on a products liability claim, case law regarding medical malpractice claims is instructive because medical and diagnostic issues are common between the two actions, the statute of limitations for both claims is two years, and discovery is sometimes at issue in determining whether the respective statutes of limitation have been triggered. The question of when a plaintiff alleging medical malpractice "discovered facts which, in the exercise of reasonable dili-

---

3. As the Court of Appeals noted, Mullens also named several other defendants in her original complaint. However, they were either not included in the amended complaint or they are not otherwise parties to this appeal.

4. Ind.Code § 33–1–1.5–5 has been recodified, without substantive change, at Ind.Code § 34–20–3–1 (1998).

gence, should lead to the discovery of the medical malpractice and resulting injury, is often a question of fact." *Van Dusen v. Stotts,* 712 N.E.2d 491, 499 (Ind.1999).

■■■ We agree with the Court of Appeals's assertion in the present case that a plaintiff need not know with certainty that malpractice caused his injury, to trigger the running of the statutory time period. *See Degussa Corp.,* 695 N.E.2d at 178. Once a plaintiff's doctor expressly informs the plaintiff that there is a "reasonable possibility, if not a probability" that an injury was caused by an act or product, then the statute of limitations begins to run and the issue may become a matter of law. *Van Dusen,* 712 N.E.2d at 499. When a doctor so informs a potential plaintiff, the plaintiff is deemed to have sufficient information such that he or she should promptly seek "additional medical or legal advice needed to resolve any remaining uncertainty or confusion" regarding the cause of his or her injuries, and therefore be able to file a claim within two years of being informed of a reasonably possible or likely cause. *Id.* (citing *Degussa,* 695 N.E.2d at 178 (quoting in turn *United States v. Kubrick,* 444 U.S. 111, 122–23, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979))). An unexplained failure to seek additional information should not excuse a plaintiff's failure to file a claim within the statutorily defined time period. *See id.*

■■■ Although "[e]vents short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's" product caused his or her injuries, a plaintiff's mere suspicion or speculation that another's product caused the injuries is insufficient to trigger the statute. *Evenson v. Osmose Wood Preserving Co. of Am.,* 899 F.2d 701, 705 (7th Cir.1990) (applying Indiana law). While Mullens might have suspected that a chemical from work was the cause of her problems when she first visited Dr. Watkins on March 17, 1992, the best that Dr. Watkins could do to respond to her concerns was to emphasize that there were a range of potential causes. *See id.* ("Although [plaintiff] himself suspected at this time [ (the time of his visit to the doctor and request for CCA chemical tests) ] that CCA was the culprit, his attempts to determine the actual cause were rebuffed by his doctors in whom he could place some reliance. What [plaintiff] had ... was not some evidence of a reasonable possibility that CCA was the cause but only a layman's mere suspicion to this effect.")

Circumstances where a physician tells a patient that a product or act is one of several "possible" causes of an injury present a complex of factually and legally relevant questions about how the physician conveyed the information to the patient and what emphasis the physician placed on the potentially tortious cause over other causes. Nevertheless, Mullens was responsible and diligently followed her physician's recommendations, undergoing further tests and attempting to gather information regarding the cause of her medical problem and its relationship to past respiratory ailments before initiating a lawsuit against Defendants. Mullens attempted to gather information that would transform speculation into a causal link that was "reasonably possible" or "probable" before she filed suit against Defendants.

On March 17, 1992, Mullens merely suspected that work products had something to do with her illness and Dr. Watkins said nothing to confirm, deny, or even strengthen her suspicions. In light of the ongoing medical consultation that Mullens undertook between March 17, 1992, and March 25, 1994, the date Mullens filed her complaint, we do not believe that the statute was triggered as late as March, 1994, as argued by Mullens. However, we also see nothing in the record to indicate that on March 17, 1992 (or even in the following eight days that would have been outside of the statutory period), Mullens's physicians had yet informed her that there was a *reasonable* possibility, if not probability,

that her ailments were caused by work chemicals.

## II

Agritek contends that the trial court erred when it failed to dismiss Mullens's complaint against Agritek. Agritek argues that Mullens falls within the definition of "employee" under the Worker's Compensation Act and therefore the court lacked subject matter jurisdiction over Mullens's negligence and strict liability claims against Agritek. As to this issue, I write to express the views of Chief Justice Shepard and myself. Because Justice Rucker is not participating in this appeal, the Court is evenly divided and the trial court will therefore be affirmed on this issue pursuant to Ind. Appellate Rule 59(B).

Prior to denying Agritek's motion to dismiss, the trial court did not conduct an evidentiary hearing. Rather, it ruled upon a paper record consisting of the parties' complaints, affidavits, and excerpts of deposition testimony. Where facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, we review the trial court's ruling de novo. *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001). In doing so, we will affirm the judgment of the trial court on any legal theory the evidence of record supports. However, the ruling of the trial court is presumptively correct, and we will reverse on the basis of an incorrect factual finding only if the appellant persuades us that the balance of evidence is tipped against the trial court's findings. *Id.*

Indiana's Worker's Compensation Act provides the exclusive remedy for employees who experience personal injury arising out of and in the course of employment. Ind.Code §§ 22–3–2–2(a) & 22–3–2–6. "Employee" means "every person, including a minor, in the service of another, under any contract of hire or apprenticeship, written or implied, except one whose employment is both casual and not in the usual course of the trade, business, occupation, or profession of the employer." Ind. Code § 22–3–6–1(b). Therefore, to be excluded from coverage under the Worker's Compensation Act, "the employee must be one whose employment is not only casual but also not in the usual course of the employer's business." *Hale v. Kemp*, 579 N.E.2d 63, 66 (Ind.1991). In addition, it is possible for an employee to be "in the joint service of two (2) or more employers," Ind.Code § 22–3–3–31, and an employee's remedies remain exclusive under the Worker's Compensation Act even in such dual employer situations.

To determine whether an employer-employee relationship exists, thus bringing an employee under the Worker's Compensation scheme because his or her employment is not casual and is in the usual course of the employer's business, we examine seven factors: (1) the right to discharge, (2) the mode of payment, (3) the supplying of tools or equipment, (4) the belief of the parties in the existence of an employer-employee relationship, (5) the control over the means used in the results reached, (6) the length of employment, and (7) the establishment of work boundaries. *GKN Co.*, at 401–02 (citing *Hale*, 579 N.E.2d at 67). These factors are weighed against each other as part of a balancing test in which the right of the employer to exercise control over the employee is given the greatest weight. *Id.*

Because Agritek challenges the trial court's jurisdiction, it bears the burden of proving that Mullens's claim falls within the scope of the Worker's Compensation Act. *Id.* at 404. Mullens and Agritek stipulated to the trial court's use of deposition excerpts and other materials for ruling on Agritek's motion to dismiss. We analyze the seven factors in light of the evidence presented in these materials and Agritek's burden of proof as follows.

*Right to discharge.* Mullens was hired following Martin's discharge of a former employee because Agritek representative Jeannie Barnes was dissatisfied with the former employee's work and requested that Martin discharge him. Martin acknowledged in his deposition that Agritek had the power to determine whether Martin should terminate an employee working on the Agritek project and that Martin would most likely carry out any such request made by Agritek, as he had done with Mullens's predecessor. The Court of Appeals recognized a similar "indirect" right of discharge in *U.S. Metalsource Corp. v. Simpson,* 649 N.E.2d 682, 685 (Ind.Ct.App.1995) (finding that while one employer in a dual employer situation did not have the direct power to terminate employment, it could, and did, terminate employment by instructing the other employer that it no longer wanted a specific employee to do work for them). While Martin, as head of Grow–Mix and a subcontractor with Agritek, would execute an employee termination decision, Agritek retained and exercised an indirect right to discharge.

*Mode of payment.* Mullens's regular paycheck came from Gro–Tec, but Agritek wrote the check for Mullens's 1991 Christmas bonus, suggesting dual responsibility for Mullens's compensation.

*Supplying of tools or equipment.* Under the agreement between Martin and Agritek, Martin supplied the building or mixing location through a lease agreement and Agritek supplied all other equipment, raw materials, formulas, and instructions with regard to the production process to persons Martin hired to perform the work. Agritek supplied, and Mullens wore, uniforms that had Agritek's name on an attached patch. In addition, Agritek provided masks and respirators for Mullens to use and reimbursed Martin if he had to reimburse Mullens for her private purchases of masks and respirators. Agritek supplied the majority of tools and equipment necessary to Mullens's work.

*Belief of the parties in the existence of an employer-employee relationship.* The Court of Appeals has held that the belief of the parties in the existence of an employer-employee relationship can often best be determined by the terms of the contract. *Nowicki v. Cannon Steel Erection Co.,* 711 N.E.2d 536, 541 (Ind.Ct.App. 1999), *transfer denied.* However, the Agritek–Martin contract is relatively brief and focuses on the lease of buildings, stock responsibilities, price paid for products, and designation of responsibility for equipment repair. Nevertheless, by the nature of their actions and shared responsibilities, Martin and Agritek, as represented by Barnes, operated such that each believed the other to have some authority over Mullens and the work she performed. Nothing in the record suggests that Martin took issue with Barnes's daily guidance and supervision of Mullens's work, nor does Agritek deny Martin's status as Mullens's co-employer. As an example of their belief that they co-employed Mullens, Barnes and Martin jointly conducted Mullens's performance reviews.

While Mullens averred that she considered herself to be a Gro–Tec employee, her belief "does not defeat the existence of [an] employer-employee relationship in light of [her] long-term acquiescence" to conditions evidencing the relationship. *U.S. Metalsource,* 649 N.E.2d at 686. The conditions of Mullens's employment outlined herein and the intensive role Barnes played in her daily routine suggest the existence of an employment relationship between Agritek and Mullens and a co-employer relationship between Martin and Agritek that exceeds the bounds of a simple, hands-off, product supply subcontract.

*Control over the means used in the results reached.* From the time Mullens began her work at the Modoc facility, she had daily contact with Barnes at Agritek's offices in Ontario, Canada. The contact consisted of at least five to seven phone calls per day and involved orders from Barnes regarding each day's work such as

products to be produced, the mixing formula Mullens was to use, customer names and shipping instructions for each product, and the order of priority in which Mullens was to mix and ship the products. In fact, Mullens had very little, if any, daily contact with Martin, although Martin generally determined Mullens's rate of pay, hours worked, and leave time. Barnes would occasionally request Mullens to work overtime, which she did. Mullens also had regular written exchanges with Barnes and would sign matters and prepare documents on behalf of Agritek, using her name in conjunction with Agritek's. On occasion, Mullens would deal directly with Agritek customers. For decisions regarding the means and results of Mullens's tasks, Barnes functioned as Mullens's daily supervisor and employer.

*Length of employment.* Martin hired Mullens for the specific purpose of carrying out the provisions of his contract with Agritek, and Barnes was intensely involved in directing Mullens's daily routine for her entire 22–month tenure working to produce animal feed under the Martin–Agritek contract. Agritek determined the length of Mullens's employment to the extent that she was hired to produce animal feed for them, Barnes made decisions regarding whether Mullens would work overtime, and Agritek held an indirect right of discharge as concluded *supra.*

*Establishment of work boundaries.* Our case law indicates that this factor primarily implicates spatial boundaries, but might also encompass temporal and other boundary issues as well. *See Nowicki,* 711 N.E.2d at 543–44. To the extent that this factor implicates other types of boundaries, we have addressed those issues under the factors examined *supra* and have determined that they favor the existence of an employment relationship between Agritek and Mullens. With respect to spatial boundaries, we find that Martin and Agritek determined together—through the terms and conditions of the agreement they signed in December, 1989—the loca-

tion of Mullens's work to be the Modoc, Indiana facility.

Thus, Chief Justice Shepard and I conclude that all seven factors indicate the existence of an employer-employee relationship between Mullens and Agritek. We believe that Agritek met its burden of demonstrating an employer-employee relationship. Indeed, there is no theory supported by the evidence in the record that supports the trial court's judgment. And, as demonstrated by the discussion under the captions "Right to Discharge" and "Control over the means used in the results reached," the factor weighted most heavily—right to exercise control over the employee—clearly indicates the existence of an employer-employee relationship between Mullens and Agritek. Under the circumstances of this case, the fact that Mullens also worked for Grow–Mix is inconsequential. Where two employers so associate themselves that both are in direct control of an employee, and the employee is made accountable to both employers, we consider the employee to have two employers. *See Walters v. Modern Aluminum,* 699 N.E.2d 671, 673 (Ind.Ct. App.1998) (quoting *U.S. Metalsource,* 649 N.E.2d at 685 (quoting in turn *Jackson Trucking Co. v. Interstate Motor Freight Sys.,* 122 Ind.App. 546, 557, 104 N.E.2d 575, 580 (1952))), *transfer denied.*

Chief Justice Shepard and I conclude that Mullens was an Agritek employee and as such is limited, with respect to her claims against Agritek, to remedies under the Indiana Worker's Compensation Act for her work-related injuries.

*Conclusion*

Having previously granted transfer in this case, thereby vacating the opinion of the Court of Appeals, we affirm the trial court's judgment denying Defendants' motions for summary judgment on the statute of limitations issue. The members of this court participating in this decision are evenly divided on whether to affirm or reverse the trial court's judgment denying

Agritek's motion to dismiss the claims against it for lack of subject matter jurisdiction. In accordance with Ind. Appellate Rule 59(B) which governs such circumstances, the trial court's judgment on this issue is also affirmed. We remand this case to the trial court for proceedings consistent with this opinion.

SHEPARD, C.J., concurs. DICKSON and BOEHM, JJ., concur except as to part II, from which they dissent. RUCKER, J., is not participating.

DICKSON, Justice.

 I concur as to Part I of Justice Sullivan's opinion, but write separately to address Part II. As we explained in *GKN Co. v. Magness,* 744 N.E.2d 397, 401 (Ind. 2001), in reviewing a case in this procedural posture, "we affirm the judgment of the trial court on any legal theory the evidence of record supports." We further emphasized that "the ruling of the trial court is presumptively correct, and we will reverse on the basis of an incorrect factual finding only if the appellant persuades us that the balance of evidence is tipped against the trial court's findings." *Id.*

Reviewing the evidence anew, Justice Sullivan's opinion finds that a Mullens/Agritek employment relationship is indicated by all of the factors enumerated in *GKN Co.* I disagree.

Beginning with the presumption that the trial court ruling is correct, as required by *GKN Co.,* Agritek has not persuaded me that "the balance of evidence is tipped against the trial court's findings." 744 N.E.2d at 401. Mullens was employed by Martin, not hired as an employee of Agritek. Throughout Mullens's employment, she was paid by Martin. Agritek's 1991 Christmas check, which plaintiff contends was intended as a gift and not as compensation for labor, pales in comparison to the two years of Mullens's compensation paid

by Martin. Mullens believes that she was employed by Martin, not Agritek. The frequency of contact between Mullens and Agritek does not convince me that Agritek's right to control Mullens was superior to Martin's. Mullens performed all her duties at a facility leased and supervised by Martin. Further, Mullens's rate of pay, benefits, working hours, and permission for medical, vacation, and holiday absences were all determined by Martin, not Agritek.

I am satisfied that the evidence of record supports the judgment of the trial court, and that the presumption of correctness of the trial court's ruling has not been overcome. I believe that the trial court should be affirmed on this issue.

BOEHM, J., concurs. SHEPARD, C.J., and SULLIVAN, J., dissent. RUCKER, J., not participating.