**Laura NICKELS, Appellant–Plaintiff,**

v.

**Julie BRYANT, Appellee–Defendant.**

**No. 57A03–0501–CV–7.**

Court of Appeals of Indiana.

Dec. 30, 2005.

1212

Edmond W. Foley, Foley & Small, South Bend, for Appellant.

Richard A. Smikle, Brian J. Paul, Angela P. Krahulik, Ice Miller, Indianapolis, for Appellee.

## OPINION

MAY, Judge.

Laura Nickels appeals the dismissal for lack of subject matter jurisdiction of her personal injury lawsuit against Julie Bryant. The trial court found that because Nickels was employed by both Bryant and New Prime, Inc. ("NPI"), her exclusive remedy is under the Indiana Worker's Compensation Act. Nickels asserts the trial court erred in finding she was an employee of both Bryant and NPI.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On December 7, 2000, Bryant was an independent contractor with NPI. Nickels was a "company driver" (App. at 18) for NPI in a semi-tractor and trailer Bryant was operating. Company drivers provide assistance to and serve as a second driver for the independent contractors in their deliveries. This enables the two drivers to travel more miles and increase the number of pick-ups and deliveries, allowing the independent contractor to make more money. The company drivers, or "second seat" (*id.* at 20) drivers apply directly to NPI and are assigned to trucks based on requests by the independent contractors. The second seat driver has no control over what loads the independent contractor accepts or rejects. While making a delivery in Arizona, Bryant backed her semi over Nickels' foot.

NPI employs approximately 700 to 900 company drivers, such as Nickels, and contracts with approximately 3,500 to 4,000 independent contractors, such as Bryant. NPI gives these independent contractors the option to lease company drivers, but does not require them to use a second seat driver.

Bryant entered into a Personnel Service Agreement with NPI in March of 2000. The contract provides in pertinent part:

1. Drivers.

    1.1 Status of Drivers. Drivers shall at all times be deemed to be and shall be employed by NPI only.

        \* \* \*

    1.4 Employment of Drivers. NPI shall have the sole authority to hire and fire the drivers. If Lessee becomes dissatisfied with the performance of a driver, Lessee may re-

quest NPI to substitute another driver in his place, and NPI shall endeavor to provide a substitute driver as soon as practical. Any expenses incurred in relieving a driver and replacing him with another driver, including the transportation of both drivers to and from Springfield, Missouri shall be borne solely by Lessee.

2. Compensation of Drivers.

2.1 Wages and Deductions. NPI shall be solely responsible for the payment of the drivers' wages and shall have the responsibility of making all deductions from such wages as are required by law, and forwarding such deductions and reports of the same to the proper state and federal authority.

(*Id.* at 81.)

Independent contractors make all decisions regarding their business with NPI. Bryant made all decisions regarding which loads to accept or reject, purchasing fuel, whether to have repairs done, where and when to have repairs performed, what equipment was necessary, where and when to purchase equipment, and purchasing insurance. Bryant had the sole discretion to remove Nickels, as second seat driver, from her truck at any time.

NPI categorizes drivers as "A," "B," or "C" seat drivers. "C" seat drivers, or student drivers, are not qualified to operate a truck without the supervision of an "A" seat driver. Nickels was a "C" seat driver and was not permitted under NPI policy to operate the truck without Bryant's permission and supervision.

Bryant was responsible for supervising and training Nickels in the business of transporting products over the road. Specifically, Bryant was responsible for training Nickels in the fundamental skills of driving the truck, backing the truck, as-

sisting another driver in backing the truck, loading and unloading the truck, planning the route, complying with all regulations and laws for the transportation of products by tractor trailer, maintaining trip logs, managing fuel, and organizing and keeping a schedule. As Nickels' trainer, Bryant determined how long Nickels would continue training.

Bryant offered evidence she trained Nickels in the following areas: (1) watching mirrors, (2) watching tandems, (3) focusing one's eyes in appropriate places when driving, (4) supervising loading and unloading, (5) shifting gears, (6) assisting in backing the truck, (7) backing the truck, (8) planning the route, (9) complying with all regulations and laws for the transportation of product by tractor trailer, (10) maintaining trip logs, (11) managing fuel effectively, and (12) organizing and keeping a schedule.

At the time of the accident, Bryant had determined Nickels was not ready to advance from the status of "C" seat driver. Nickels could not back the truck without supervision, did not know how or when to fuel the truck, and did not know how to plan a trip based on fuel consumption.

Bryant was responsible for supervising Nickels as she performed the tasks required of her by the employment and while making deliveries. Bryant was responsible for Nickels' conduct with respect to the performance of her duties, and Bryant had to review for accuracy documents Nickels submitted to NPI, such as driving logs and bills of lading.

Bryant was responsible for reimbursing NPI for costs associated with hiring Nickels. Those costs included all of Nickels' wages, tax liability incurred in connection with those wages, worker's compensation coverage, a share of the cost of Nickels' group health and life insurance coverage,

and payment of the matching portion of Nickels' 401(k) contributions. NPI processed Nickels' wages at a fee of $10.00 per month to Bryant, but the costs associated with Nickels' employment as a second seat driver came directly from Bryant. The $10.00 monthly charge covered the use of NPI's computers and personnel to process the payment. NPI does not profit from an independent contractor's hiring of a second seat driver.

## DECISION AND DISCUSSION

■ "Where the facts are in dispute but the trial court rules on a paper record without conducting an evidentiary hearing, then no deference is afforded the trial court's factual findings or judgment because under those circumstances a court of review is 'in as good a position as the trial court to determine whether the court has subject matter jurisdiction.'" *GKN Co. v. Magness*, 744 N.E.2d 397, 401 (Ind.2001) (quoting *MHC Surgical Ctr. Assocs., Inc. v. State Office of Medicaid Policy & Planning*, 699 N.E.2d 306, 308 (Ind.Ct.App. 1998)). The reviewing court will affirm the judgment of the trial court on any legal theory the record supports. *Id.*

■ The Indiana Worker's Compensation Act ("the Act") provides the exclusive remedy for employees who suffer injuries arising out of and in the course of employment. Ind.Code § 22–3–2–6. The Act bars a court from hearing a common-law claim brought against an employer for an on-the-job injury. *GKN*, 744 N.E.2d at 402. However, it does permit an action against a third-party tortfeasor, as Bryant is alleged to be here, if the third-party is neither the plaintiff's employer nor a fellow employee. *Id.*

■ The Act contemplates one worker may simultaneously have two employers. *See* Ind.Code § 22–3–3–31 (where employee is in the joint service of two or more employers, both are obliged to contribute to payment of compensation in proportion to their wage liability to the employee). However, even where an employee has multiple employers, the Act remains the employee's exclusive remedy. *Degussa Corp. v. Mullens*, 744 N.E.2d 407, 412 (Ind.2001), *reh'g denied.*

■ Whether there is a dual employment relationship for purposes of the Act is determined by weighing and balancing seven factors: (1) the right to discharge; (2) the mode of payment; (3) who supplies the tools or equipment; (4) whether the parties believe there is an employer-employee relationship; (5) the control over the means used in the results reached; (6) the length of employment; and (7) the establishment of work boundaries. *Id.; GKN*, 744 N.E.2d at 402. These seven factors must be weighed as part of a balancing test; they are not "a mathematical formula where the majority wins." *GKN*, 744 N.E.2d at 402. The most important factor, although not solely decisive, is the right to control the manner and means by which the work is to be accomplished. *Id.* at 403.

### 1. Right to Discharge

Bryant was an independent contractor with NPI. Pursuant to her contract with NPI, Bryant could not terminate Nickels' relationship with NPI. However, NPI's controller, Darryl Hopkins, testified Bryant "could fire [Nickels] from her truck ...." (App. at 108.) While Bryant was not authorized to directly hire Nickels on behalf of NPI, no restraint was placed on Bryant's authority to fire Nickels from her truck for any reason.

We recognized a similar "indirect" right of discharge in *U.S. Metalsource Corp. v. Simpson*, 649 N.E.2d 682, 685 (Ind.Ct.App. 1995), finding that even though one em-

ployer in a dual employer situation did not have direct power to terminate employment, it could, and did, terminate employment by instructing the other employer that it no longer wanted a specific employee to do work for it. *See also Degussa,* 744 N.E.2d at 413 (original employer was responsible for executing an employee termination decision, but the other employer retained and exercised an indirect right to discharge the employee). This factor weighs in favor of the conclusion there was an employer-employee relationship between Bryant and Nickels for purposes of the Act.

### 2. *Mode of Payment*

In *GKN,* GKN was a general contractor on a highway project. Starnes Trucking, Inc. ("Starnes") contracted with GKN to haul materials to and from the job site. Starnes hired Larry Magness to operate a cement truck and haul materials to and from GKN's job site. Magness was injured at the GKN plant.

Starnes paid Magness, withheld his taxes, paid his worker's compensation premiums, and provided him with health insurance. GKN was responsible only for signing Magness' time card and reimbursing Starnes for all payments related to Magness' employment at GKN's sites. The Court held the mode of payment weighed against an employer-employee relationship. However, the fact Magness received his paycheck directly from Starnes would not defeat the existence of an employer-employee relationship between Magness and GKN. 744 N.E.2d at 405.

Bryant testified she was responsible for paying Nickels' wages, taxes, worker's compensation coverage, and the proportionate share of the cost of Nickels' group health and life insurance coverage. Hopkins testified independent contractors pay all of the second seat driver's wages, worker's compensation and health care coverage costs, and any matching portion of 401(k) deposits.

NPI processed the payments from Bryant to Nickels through its payroll system, but it deducted all payments to Nickels from the money NPI owed Bryant. Therefore, even though Nickels received her paycheck from NPI, the money came from Bryant. The costs of employing Nickels came indirectly from Bryant. As a result, NPI and Bryant shared responsibility for Nickels' compensation. *See Degussa,* 744 N.E.2d at 413 (where the regular paycheck came from one employer and the Christmas bonus came from another employer, dual responsibility and contributions to compensation weighed in favor of an employer-employee relationship).

This factor supports the conclusion that an employer-employee relationship existed between Bryant and Nickels for purposes of the Act.

### 3. *Supplying Tools or Equipment*

Bryant leased the truck in her name. She was responsible for all maintenance expenses and for all expenses related to fuel, tolls and travel. Therefore, all equipment necessary for Nickels' employment was leased, provided and maintained by Bryant. This factor suggests there was an employer-employee relationship between Bryant and Nickels for purposes of the Act. *See id.* (where a party supplied the majority of the tools and equipment necessary to the work, the factor weighed in favor of an employer-employee relationship).

### 4. *The Parties' Belief there was an Employer–Employee Relationship*

■ Bryant considered herself Nickels' employer. Nickels did not present evi-

dence regarding her belief about the nature of her relationship with Bryant. However, a mutual belief in the existence of an employer-employee relationship is not necessary. *See U.S. Metalsource,* 649 N.E.2d at 686; *Beach v. Owens–Corning Fiberglas Corp.,* 542 F.Supp. 1328, 1330 (N.D.Ind.1982) (finding employer-employee relationship even though the employee did not believe he was an employee of the third party), *aff'd* 728 F.2d 407 (7th Cir. 1984), *cert. denied* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984).

Nickels argues the language in Bryant's contract with NPI proves Nickels was employed by NPI only. The agreement explicitly states the company driver is employed by NPI, NPI has the sole authority to hire and fire a company driver, and NPI is solely responsible for the payment of the drivers' wages and for making all deductions from such wages as required by law. However, nothing in the seven-factor test states a contract between two employers is determinative of the legal relationship formed and maintained by a specific employer and employee. *GKN,* 744 N.E.2d at 402. This factor therefore weighs in favor of concluding there was an employer-employee relationship between Bryant and Nickels for purposes of the Act.

### 5. *Control Over the Means Used in Reaching the Result*

Although not dispositive, control is the most important factor. *GKN,* 744 N.E.2d at 405. The result to be reached was the delivery of products to customers. Bryant controlled the means used in reaching this result, as she was responsible for the truck and all equipment used in making deliveries. Bryant's status as Nickels' trainer demonstrates Bryant's responsibility for and authority over Nickels' actions in performing the deliveries.

Nickels notes she drove the truck, took care of the logs, and handled her own loading and unloading while Bryant rested. This, she argues, requires the conclusion Bryant did not have control over the means used in making the deliveries. However, Nickels' performance of these duties was ultimately subject to Bryant's authority.

As a "C" seat driver, Nickels could not operate the truck without Bryant's permission and supervision. Bryant was in control of Nickels' training in all aspects of driving the truck, such as how to maneuver the truck under various circumstances, shift gears, watch mirrors, and assist another driver in backing the truck. Bryant set the driving schedule. Hopkins testified Bryant had the authority to control the truck's speed and determine when the team would stop for breaks. Decisions whether to accept or reject a load for delivery were under Bryant's ultimate authority and control.

Bryant not only controlled the physical means used in making the deliveries, but also had authority over Nickels as her direct supervisor and trainer. Bryant had control over the route, driver schedules, and Nickels' operation of the truck. This factor weighs in favor of the conclusion an employer-employee relationship existed between Bryant and Nickels for purposes of the Act.

### 6. *Length of Employment*

■ Longer employment indicates an employer-employee relationship. *Id.* at 406. In *GKN,* a three-month relationship was too abbreviated to show an employer-employee relationship. *Id.*

Nickels worked for NPI and with Bryant for approximately eight months. Nickels applied to NPI so she could be assigned to Bryant's truck. This factor weighs in favor of the conclusion that an

employer-employee relationship existed between Bryant and Nickels for purposes of the Act.

### 7. *Establishment of Work Boundaries*

Nickels argues because NPI instructed her to report to Bryant and assigned her to Bryant's truck, NPI established her work boundaries and responsibilities. However, Bryant significantly contributed to establishing the work boundaries pursuant to her agreement that NPI provide Nickels as a second seat driver. Bryant was responsible for and had authority over the truck. Nickels was a "C" seat driver, so Bryant was responsible for training Nickels each day in all aspects of trucking and delivering products for NPI, and Nickels could not operate the truck without permission from Bryant.

An employer need not have complete control over an employee for an employer-employee relationship to exist. *Id.* "Where two employers so associate themselves together so that both are in direct control of the employee and he is made accountable to both, he will be considered an employee of both." *Id.*

Bryant had sufficient authority over and responsibility for Nickels to indicate an employer-employee relationship between Bryant and Nickels for purposes of the Act.

### CONCLUSION

Application of the seven-factor balancing test supports the trial court's conclusion an employer-employee relationship existed between Bryant and Nickels for purposes of the Act. Accordingly, we affirm.

Affirmed.

KIRSCH, C.J., and ROBB, J., concur.