**Marla BRIN, Appellant,**

v.

**S.E.W. INVESTORS, et al., Appellees.**

No. 02–CV–649.

District of Columbia Court of Appeals.

Argued Dec. 14, 2004.

Decided July 13, 2006.

Marc Fiedler, with whom William P. Lightfoot, Washington, DC, was on the brief, for appellant.

Andrew Butz, with whom Keith M. Bonner, Washington, DC and Shalini K. Kedia, were on the brief, for appellees.

Before REID and GLICKMAN, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

Appellant Marla Brin filed a complaint against S.E.W. Investors and five other appellees [1] seeking damages for injuries allegedly incurred as a result of the defective air quality in the building in which she worked. The trial court granted judgment in favor of appellees on the ground that the law suit was barred by the statute of limitations. We hold, contrary to the view of the trial court, that under the discovery rule, the statute of limitations did not begin to run in this case until Brin received, or with the exercise of due diligence could have received, expert medical advice that the defective air quality was a plausible cause of her injuries. Accordingly, we reverse and remand for further proceedings.

## I. Facts[2]

Marla Brin ("Brin") began working for the Environmental Protection Agency ("EPA") on February 26, 1990, as an attorney/advisor. During the tenure of her employment with the EPA, Brin's office was located at Waterside Mall ("Waterside"), a

---

1. The six appellees allegedly had ownership or leasehold interests in the relevant premises or responsibilities with respect thereto. For convenience, we shall hereinafter refer to them collectively as "SEW."

2. As discussed in Part II.C., *infra,* the trial court erroneously treated the statute of limitations issue as one of "subject matter jurisdiction." Properly viewed, the question was one of a possible grant of summary judgment. We thus present the facts, in abbreviated form, in the light most favorable to appellant, the nonmoving party.

property owned and managed by SEW. The day after she started work, Brin developed a rash and hives and her eyes twitched and burned. In the following months, she experienced difficulty in concentrating on her work and began to feel fatigued.

The conditions of the Waterside building shortly before Brin began working there were recounted by us in *Bahura v. S.E.W. Investors,* 754 A.2d 928 (D.C.2000), a case brought by a group of six representative plaintiffs who were EPA employees in the building.[3] Between 1986 and 1989 the Waterside building had undergone major renovations during which contractors replaced carpeting and ceiling tiles, rebuilt and repainted walls, and installed new office dividers.

> Soon after the renovations began, substantial numbers of EPA employees began to report health problems that they attributed to the defective quality of the indoor air at Waterside Mall.... [T]he nurse in charge of the EPA health clinic[ ] testified that over 225 employees came to the clinic complaining of "headache, nasal congestion, hoarseness, ... burning eyes, watering eyes[,] mental confusion, blurred vision, [and] tingling of the fingers." [The EPA nurse] stated that some patients were so ill that she found it necessary to escort them out of the building, but noted that with exposure to fresh air "[t]he symptoms would start to disappear, [and] the employee would get much better. Sometimes the symptoms would completely disappear."

In 1988, the agency commissioned a survey which was designated to ascertain the extent of neurological symptoms (sometimes called "sickbuilding syndrome") among employees at the Waterside Mall. Over 80% of the employees responded. One half of the respondents reported unusual fatigue, 41% had difficulty concentrating, 61% often or sometimes suffered from headaches, and significant numbers reported other neurological symptoms.

*Id.*

The defective air quality conditions complained of in *Bahura* were still present when Brin began working at Waterside in February 1990. During another renovation project in March 1990, the air quality was poor and particles such as soot and ceiling matter were knocked onto employee desks in the corridor. The smell of fumes from roofing materials and fumes from a dry cleaning store beneath Brin's office were frequently detectable, as was the presence of mold. In an effort to express her concerns about the conditions of Waterside and the risk of being exposed to chemicals, Brin wrote to the EPA Administrator, William Reilly, shortly after beginning work in her new job, urging that he move the EPA to a new building. In her letter, Brin wrote that she had "been informed that there are problems with this building, and that our new building will not be available until 1995." In response to Brin's letter to Reilly, Charles Bresler, President of Town Center Management Corp., wrote to Brin insisting that she provide proof of her accusations that the

---

**3.** When *Bahura* was filed in the Superior Court sometime in late 1990, Brin's deposition testimony reveals that there were "whispers that people were filing a lawsuit, [but she] didn't know what it was about or the people involved." When Brin began working at the EPA in February 1990, she worked across the hall from and became acquainted with one of the *Bahura* plaintiffs, Susan Watkins. The trial itself took place over seven weeks beginning in October 1993. In *Bahura,* we noted that "[t]he evidence of serious environmental difficulties at the EPA's own headquarters was widely publicized and came to the attention of Congress." *Id.* at 932.

Waterside environment was unhealthy. He also warned Brin that the statements in her letter, if untrue, "could be libelous and defamatory." Brin perceived Bresler's letter to be a threat to bring a defamation suit if she blamed Waterside for health problems without presenting proof of a causal relationship between her ailments and the conditions at Waterside. Brin declined to pursue the matter further until she had solid proof.

In the spring of 1992, Brin became aware that she might be ill because she began to sustain muscle injuries during normal acts of exertion and began experiencing unusual fatigue. She met with Dr. Dawn Reed Jones on July 21, 1992, and gave a history of multiple insect bites while gardening. Dr. Reed Jones tested Brin for Lyme disease and the results were negative. Per Dr. Reed Jones's referral, Brin met with Dr. Joseph Laukaitis on July 31, 1992 for a rheumatologic consultation. Brin complained of muscle pain, cramping, tightness, fatigue, difficulty sleeping, eczema, frequent hives, and photosensitivity. Dr. Laukaitis noted that the

> [e]tiology of [Brin's] muscuskeletal pain is not clear. However, some of the more diffused pain involving her neck and upper back, together with multiple tender points and a recent history of increasing fatigue and poor sleep suggests a diagnosis of fibromyalgia.[4] Her chronic calf muscle pain may be due to straining from new shoes or from her rollerblad-

ing. This may become more clear as we initiate treatment for the fibromyalgia.

In the fall of 1992, Brin went on a part-time work detail at the Department of Health and Human Services ("HHS") because she suspected that her ailments might have something to do with the conditions at Waterside. Brin's part-time detail at HHS ended in April 1993, whereupon she returned to Waterside; she had not recovered from her pain, weakness, and fatigue. On May 17, 1993, Brin met with Dr. Robert Gerwin for the first time since 1989[5] for a neurological consultation because she was experiencing multiple health ailments, including extreme weakness, clumsiness, poor balance, blurry vision, and headaches. Dr. Gerwin suggested that Brin undergo an MRI scan of her brain to check for a demyelinating disease.[6] Brin did undergo an MRI scan, but it showed no evidence of multiple sclerosis. In August 1994, Brin met with Dr. Gerwin again because she was experiencing problems with walking, seeing, speaking, comprehending reading materials, thinking, and remembering. Brin informed Dr. Gerwin that she was concerned that she may have been exposed to toxins while at work.[7] Brin underwent another MRI scan to check for another condition, but the results were normal. Dr. Gerwin referred Brin for neuropsychological testing.

In October 1994, Brin underwent psychological testing per Dr. Gerwin's referral. In recounting Brin's medical history,

---

4. " '[F]ibromyalgia' literally means muscle fiber pain." 6 ATTORNEYS' TEXTBOOK OF MEDICINE 25.00 (Roscoe N. Gray, M.D. & Louise J. Gordy, M.D., eds., 3d ed. 1998).

5. When Brin was seen by Dr. Gerwin in 1989 to evaluate whether she had myofascial pain syndrome, she was not employed by the EPA.

6. A demyelinating disease is one "of unknown cause that affect[s] the myelin sheaths of nerve fibers[;] ... multiple sclerosis is the

most common" of such diseases. AM.JUR. 3d *Attorney's Illustrated Medical Dictionary* D30 (2002).

7. In his deposition, Dr. Gerwin testified that, "[Brin] thought that there was a possibility that the strange things that were happening to her could have been due to being exposed to toxins. It was an issue that she was clearly concerned about."

the examiner wrote that Brin had been "[e]xposed to solvents at the EPA office building (Waterside)." The examiner also wrote, "Patient complains of problems with short term memory, has difficulty finding words ... during conversation, is easily confused[,] and has difficulty reading." The results of that examination revealed some neuropathy, nerve injury, diminished sensation, and sensory dysfunction. In a neuropsychological evaluation conducted by Dr. John M. Smothers on December 10, 1994, he wrote:

[Brin] believes that her employers exposed her to gasses and solvents in a "sick building." Therefore, she is unable to remember events clearly. She list gasses and fumes that could come from laser printers, from the "carpeting" which covers room dividers, as possible contaminants. She states the office building in which she works had poor ventilation. [Brin] also states that she was in an automobile accident. She reports that she "smashed" her head on the passenger's window side, and said she lost consciousness. [She] did not say how long she was unconscious. [Brin] also says that she may be experiencing a demyelinating disease. Dr. Smothers concluded that Brin was "organically intellectually impaired."

On December 14, 1994, Brin met with neurologist Dr. Peter G. Bernard because she had difficulty walking, memory problems, neck pains, and loss of motor control. She informed Dr. Bernard that "she believes her employer exposed her to gasses and solvents in a 'sick building' and that she is unable to remember events clearly." She also informed Dr. Bernard that she experienced trauma in the past when she was involved in a car accident. Dr. Bernard concluded that Brin might be suffering from an unknown neurologic disease.

In February 1995, Dr. Gerwin referred Brin to Dr. Jack Griffin because Brin had a difficult condition for which Dr. Gerwin did not have a diagnosis. In his referral letter to Dr. Griffin, Dr. Gerwin wrote:

[Brin] reports that she was in a "sick building" and that environmental toxins were identified. She states that the area that she works in has the highest concentration of these materials in the air. She also states that a number of other people were disabled because of cognitive dysfunction following the exposure to essentially the same degree that she had an[d] that they won their case in court. She has a list of such toxins that were identified and will bring some of the major elements of the court transcript a[s] it bears on the problem for our review.[8]

In April 1995, Dr. Gerwin prepared a statement in connection with Brin's application for disability retirement. In recounting Brin's history, Dr. Gerwin wrote that Brin had been in an automobile accident in which she hit her head on a windshield, and "may have been exposed to neurotoxic substances such as benzene, toluene, and phenolics." Brin completed her disability application in June 1995. In response to a question on the application asking the approximate date of her disability, Brin replied, "I began declining in the summer of 92, was borderline in 93, and useless in 94." In August 1995, Brin was awarded Social Security Disability and was retired two months later from the EPA on disability.

In May 1995, Brin saw another neurologist, Dr. Charlene Macko, who concluded

---

8. Brin denies having told Dr. Gerwin that she had a list of toxins. Rather, she contends that while Dr. Gerwin may have asked her if she had any documents identifying the toxins present at Waterside, she never told him that she could give them to him.

that there was no consistent evidence of clinical neuropathy or a demyelinating disorder. With respect to Brin's social history, Dr. Macko wrote:

[Brin] reports exposure to high tension power lines. Five people on her block were diagnosed with leukemia including four children and adults. She has also worked in a "[s]ick building" where there have been environmental toxins identified and she works in the area with the highest concentration of these materials. We do not have a list of the chemicals at this point.

On August 14, 1995, Brin was seen by Dr. Leslie Huszar, complaining of, *inter alia*, weakness, fatigue, comprehension, memory loss, and difficulty walking. Dr. Huszar conducted a neurological examination on Brin and noted that she showed signs of asymmetric peripheral neuropathy. Dr. Huszar wrote that although Brin suspects that she was exposed to solvents, "she does not know how and why her symptoms started." [9]

Brin visited Dr. Gerwin again in August 1995, continuing to complain of having difficulty with thinking, concentrating, and remembering. As to a possible cause of Brin's problems, Dr. Gerwin wrote:

[Brin] claims to have worked in a "sick" building for the EPA. I independently spoke with a doctor who performed testing in this building and he informed me that indeed this EPA building was known as a "sick" building and that there were instances of individuals who were adversely affected. The patient claims to have worked in an area where the highest concentration of material

were [sic] alleged to have caused problems but I have no confirmation of that.

However, in declining to blame Waterside for Brin's problems, Dr. Gerwin opined in his report:

The history that [Brin] gives would raise the question of a toxic disorder but this certainly has not been established. No abnormality of the laboratory studies has yet shown or led to a diagnostic etiology. No treatment has been identified for this problem partly because there is no underlying etiology at the present time so it is not clear what one would do to treat.

And at his deposition, Dr. Gerwin testified:

I will tell you that in the late eighties, early nineties there were a spate of people coming in ... complaining about sick building syndrome, an extraordinarily difficult diagnosis to make, and most of the time it is not the case. It seldom is the case. There's a high degree of skepticism when someone comes in and tells you they have sick building syndrome or ... they are ill because of sick building syndrome.

From mid–1995 through mid–1997 Brin continued to be seen by Dr. Laukaitis for chronic neck pain, chronic ankle pain, right shoulder pain, and lower back pain—conditions that Dr. Laukaitis continued to diagnose as fibromyalgia. In 1996, Brin was seen by Dr. Cynthia Durakis, who treated her for neck pain. Brin informed Dr. Durakis that there were two possible causes for her neck pain: (1) an automobile accident, and (2) an incident at her workplace where she experienced organic solvent poisoning.

9. In August 1995, Brin also met with Dr. Suzanne Griffin and complained of, *inter alia*, severe depression, anxiety, sleep disturbance, poor concentration, and suicidal and homicidal thoughts. Brin gave a medical history of allergies, a diagnosis of fibromyalgia, and a diagnosis of bipolar disorder. Dr. Griffin diagnosed Brin as having bipolar disorder type II, post-traumatic stress disorder, and ataxia. In her report, Dr. Griffin also stated that Brin demonstrates cognitive difficulty in sequencing history and information.

In the summer of 1998, Brin's former co-workers provided her with documents regarding the air quality at Waterside. Brin testified that these documents were not previously available because they were produced only through discovery in the *Bahura* case, and once produced, counsel for the plaintiffs insisted that the documents be kept confidential. Some of the documents that Brin received from her former co-workers were environmental studies that had been done at Waterside. In September 1998, Brin was examined by Dr. John M. Balbus, who reviewed the Waterside air-quality reports. He observed that although the reports were dated from 1988 to 1990, there was evidence that the same problems present during that period of time continued to be present at Waterside when Brin's symptoms developed (*i.e.*—1993 to 1995). Dr. Balbus concluded that "it is likely that [Brin] was exposed to elevated levels of volatile organic chemicals as well as airborne bacterial and fungal elements during her time working [at Waterside]." He opined that

> exposure to these indoor air contaminants, at levels comparable to those documented in previous testing, to a reasonable degree of medical certainty, exacerbated or aggravated [Brin's] encephalopathy. While I cannot state with certainty that such exposure was the sole or was not the sole cause of [Brin's] condition, it is my opinion that such exposure to indoor air contaminants in her workplace contributed to [her] cognitive impairment, leading to her eventual retirement.[10]

Now finally possessing this medical opinion linking her condition to the air quality at Waterside, Brin filed suit in the Superior Court on October 2, 1998. In her deposition, when asked by her counsel why she had not filed suit earlier, she answered: "Well, I guess a lot of reasons altogether, like, for one I had no proof and, for two, the doctors, up until then, had said no, we don't think this is the problem, or it's all in your head, or whatever."

SEW moved for summary judgment on two occasions, arguing in both motions that Brin's action was time-barred. Because in his view SEW had not met its burden of showing that there was no genuine issue of material fact as to when Brin knew or should have known the cause of her injury, the trial judge initially assigned to this matter denied both motions for summary judgment.

Brin's case was subsequently transferred to the civil calendar of another trial judge. SEW filed a motion to bifurcate the trial so that the statute of limitations issue would be tried separate and apart from the merits of the case. At a pre-trial hearing on the motion, the new trial judge stated that she looked at the previous judge's orders denying SEW's motions for summary judgment. She isolated an issue that the parties may not have noticed that she termed one of "jurisdiction." In raising the jurisdiction issue, *sua sponte*, the trial judge stated that she thought the court owed the parties a ruling on that issue before the trial commenced. After further submissions and a hearing, at which only the appellant testified on the statute of limitations issue, the trial judge issued a memorandum opinion and order dismissing Brin's cause of action on the ground that it was time-barred, concluding that under her interpretation of the discovery rule, Brin was on inquiry notice of her cause of action prior to October 2, 1995, more than three years before the filing of the complaint. This appeal followed.

## II. The Discovery Rule and Causation

■ The parties agree that, with respect to Brin's claims, the applicable District of Columbia statute of limitations re-

---

10. A week later, Dr. Gerwin submitted a re- port echoing Dr. Balbus's medical opinion.

quired that the action be brought within three years "from the time the right to maintain the action accrues." D.C.Code § 12–301(8) (2001). The task is left to the courts of determining when "the right to maintain the action accrues" within the meaning of the statute. "A claim usually accrues for statute of limitations purposes when injury occurs, but in cases where the relationship between the fact of injury and the alleged tortious conduct [is] obscure, this court determines when the claim accrues through application of the discovery rule...." *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 945 (D.C.2003) (internal quotations and citations omitted). We have applied the discovery rule in a number of contexts,[11] and the parties agree that the discovery rule is applicable to this case. The basic question as presented to us in this appeal is whether accrual was dependent on Brin's receipt of medical advice concerning a link between the air quality and her injuries and how definitive that advice needed to be. To answer that question, we begin by examining the history of the discovery rule in our jurisprudence.

### A.

The elements of the discovery rule were first set out in full in our jurisdiction in the medical malpractice case of *Bussineau, supra* note 11, 518 A.2d at 435.[12] We held that "for a cause of action to accrue where the discovery rule is applicable, one must know or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing." *Id.* In requiring a plaintiff to have some evidence of wrongdoing before her cause of action is deemed to accrue, we noted (1) that it would be inconsistent with notions of justice to find that a plaintiff's claim accrued before she would reasonably know of any wrongdoing, *id.* at 428, and (2) an accrual rule that does not require knowledge of wrongdoing would encourage the filing of unfounded claims by plaintiffs seeking to protect their own interests. *Id.* at 431. In expanding upon the meaning of "*some* evidence of wrongdoing," our extensive discussion in subsequent cases makes it clear that the plaintiff need not have knowledge of the precise breadth or nature of the tortious action. *See, e.g., Morton, supra* note 11, 725 A.2d at 469 ("fact that appellants lacked full knowledge of the extent of appellees' alleged wrongdoing" did not stay accrual of cause of action);[13] *Cevenini, supra* note 11, 707 A.2d at 771 ("Appellants' assertion of an 'each element' or 'all elements' test of

11. *See, e.g., Wagner v. Sellinger*, 847 A.2d 1151 (D.C.2004); *Brown v. Nat'l Academy of Scis.*, 844 A.2d 1113 (D.C.2004); *Berkow v. Hayes Nat. Training School*, 841 A.2d 776 (D.C. 2004); *Hardi v. Mezzanotte*, 818 A.2d 974 (D.C.2003); *Doe, supra*, 814 A.2d 939; *Morton v. Nat'l Med. Enters., Inc.*, 725 A.2d 462 (D.C.1999); *Cevenini v. Archbishop of Washington*, 707 A.2d 768 (D.C.1998); *Hendel v. World Plan Executive Council*, 705 A.2d 656 (D.C.1997); *Diamond v. Davis*, 680 A.2d 364 (D.C.1996); *Farris v. Compton*, 652 A.2d 49 (D.C.1994); *Colbert v. Georgetown Univ.*, 641 A.2d 469 (D.C.1994) (en banc); *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423 (D.C.1986).

12. The discovery rule was first applied in *Burns v. Bell*, 409 A.2d 614 (D.C.1979), where we addressed only the elements of injury and cause in fact. In its brief, SEW relies significantly in support of its position on *Dawson v. Eli Lilly & Co.*, 543 F.Supp. 1330 (D.D.C. 1982), and *Kelton v. District of Columbia*, 413 A.2d 919 (D.C.1980), but both of these cases were decided well before *Bussineau* and our many subsequent cases spelling out the dimensions of the discovery rule in our jurisdiction.

13. *Morton* also noted that in *Bussineau*, we had declined to adopt the rule of some jurisdictions that a medical malpractice cause of action does not accrue until a claimant has had the opportunity to discover all of the

accrual is without support in the case law[.]"); *Hendel, supra* note 11, 705 A.2d at 661 ("a right of action may accrue before the plaintiff becomes aware of all of the relevant facts."). Because the quantum of knowledge sufficient to put one on notice of her claims against another varies from case to case, we have recognized that "the standard of 'some evidence of wrongdoing' is far from a precise one." *Diamond, supra* note 11, 680 A.2d at 380.

Our approach has been similar when the question involves the plaintiff's knowledge of the "injury" that she has suffered. Our en banc decision in *Colbert, supra* note 11, 641 A.2d 469, is instructive in that regard. A delayed mastectomy in 1982 had, to the plaintiff's knowledge, greatly increased the risk of metastasis. Evidence of metastasis did not appear until 1986 and the plaintiff filed suit within three years thereafter. However, because of the delayed mastectomy, the plaintiff had undergone in 1982 and 1983 otherwise unnecessary radiation treatment that had caused her third-degree burns, loss of body function, pain and emotional trauma. We held that the statute of limitations barred plaintiffs's action. "It is not necessary that all or even the greater part of the damages have to occur before the cause of action arises. Any appreciable and actual harm flowing from the [wrongdoer's] negligent conduct establishes a cause of action...." *Id.* at 473

(internal quotations and citations omitted).[14]

■■■ We think these general principles requiring knowledge of some evidence of wrongdoing and knowledge of some injury inform us of the proper approach to be taken when the issue is one of causation between a manifest illness and wrongdoing of which there is some evidence. This almost invariably will be a subject "beyond the ken of laypersons." *Burke v. Scaggs,* 867 A.2d 213, 219 (D.C.2005). "Patients who seek medical care are not responsible for diagnosing their own condition, but must rely on the physician's expertise to determine the cause of the problem and provide treatment." *Hardi, supra* note 11, 818 A.2d at 980 (internal citations omitted). In order to meet the burden of proof in such cases, the plaintiff, again almost invariably, will have to rely at least in part upon the presentation of expert medical opinion. "In cases presenting medically complicated questions ..., we have held that expert testimony is required on the issue of causation." *Williams v. Patterson,* 681 A.2d 1147, 1150 (D.C.1996) (internal quotations and citations omitted).[15] Since patients must rely on their doctors, a person cannot reasonably be expected or required to act until that person has some medical advice to support a linkage between a known injury and wrongdoing of which the person has some evidence.

essential elements of a possible cause of action. 725 A.2d at 469.

14. There is an extensive body of law dealing with the question of the accrual of a cause of action under a statute of limitations where injury manifests itself only many years after the initial wrongdoing, notably in toxic tort cases. *See generally* 3 FRANK P. GRAD, TREATISE ON ENVIRONMENTAL LAW § 4A.03[2][a] (2004). That issue is not before us here, since Brin's maladies were apparent at an early time. Likewise, Brin does not argue that she did not have "some evidence of wrongdoing" prior to

October 2, 1995. The problem is in proof of causation. For a relatively recent overview, with many citations to prior writings, *see* Danielle Conway–Jones, *Factual Causation in Toxic Tort Litigation: A Philosophical View of Proof and Certainty in Uncertain Disciplines,* 35 U. RICH. L.REV. 875 (2002).

15. We recently had occasion to discuss the sufficiency of proof of causation in asbestos litigation to withstand a grant of summary judgment, although no statute of limitations issue was involved. *Weakley v. Burnham Corp.,* 871 A.2d 1167 (D.C.2005).

On the other hand, while mere suspicion cannot supply that linkage, the medical advice need not show a linkage to a "reasonable medical certainty." By analogy to some evidence of wrongdoing and some injury in fact, a medical opinion that the wrongdoing is a plausible cause of the known injuries will trigger the running of the statute of limitations, just as is the case with "some evidence of wrongdoing." With "some evidence of wrongdoing," it is reasonable to expect that the plaintiff, by filing suit, may take advantage of the ample discovery devices now available in litigation to round out the proof of tortious misconduct. Likewise, with some medical opinion that the perceived evidence of wrongdoing is a plausible cause of the illness, the plaintiff can be expected to promptly seek additional medical and legal advice to illuminate the causal issue. Further, details of the wrongdoing obtained in litigation may supply the additional factual basis needed to establish the causal link with reasonable medical certainty. Or, in discovery, evidence may be developed to supplement the medical evidence that will be sufficient to support a jury finding of liability, as was indeed the case in *Bahura*.

To expand briefly upon the phrase "plausible cause," we contemplate that the plaintiff will have received medical advice that specifically identifies the wrongdoing of the defendant to be included among the reasonably possible causes of her maladies, although at that point, the medical expert may not be able to opine, "based upon a reasonable degree of medical certainty, that a defendant's negligence is more likely than anything else to have been the cause (or a cause) of a plaintiff's injuries." *Hinch v. Lucy Webb Hayes Nat'l Training Sch.*, 814 A.2d 926, 929 n. 4 (D.C.2003) (quoting *District of Columbia v. Watkins*, 684 A.2d 395, 402 (D.C.1996)). We think

that to use the phrase "reasonably probable" would too closely approximate this normally applicable standard of ultimate proof required of the plaintiff, "firmly embedded in our law," *Grant v. Am. Nat'l Red Cross*, 745 A.2d 316, 319 (D.C.2000), without regard to the further amplification that, for example, discovery might unearth.[16] In the end, we perhaps simply must remain mindful that here, as with "some evidence of wrongdoing," the standard is "far from a precise one." *Diamond, supra* note 11, 680 A.2d at 380.

A final aspect of the operation of the discovery rule that should be noted is its qualification that the plaintiff must know "or by the exercise of reasonable diligence should know." Thus, the plaintiff is charged with what might be called "inquiry knowledge;" that is, knowledge that he does not actually have but which he would have discovered had he exercised reasonable diligence in acting on the information available to him. *See id.* at 370–72. The discovery rule does not give a plaintiff *carte blanche* to defer legal action indefinitely. *See Morton, supra* note 11, 725 A.2d at 468; *Hendel, supra* note 11, 705 A.2d at 661. In other words, two distinct questions may be involved. The first is what facts are sufficient to put a plaintiff on "inquiry notice;" that is, what facts are sufficient to trigger the obligation to make a reasonable investigation into the possible existence of a cause of action. The second is what must be discoverable by such an investigation; that is, what "knowledge" must a plaintiff have, whether actual or discoverable upon reasonable inquiry, about the existence of a cause of action before the statute of limitations begins to run. *See Wagner, supra* note 11, 847 A.2d at 1154; *Cevenini, supra* note 11, 707 A.2d at 771. The second consideration has been

**16.** See also note 19 *infra.*

the subject on which the foregoing discussion in this opinion has concentrated. As to the first consideration, " 'the critical question in assessing the existence *vel non* of inquiry notice is whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him.' " *Doe, supra,* 814 A.2d at 945–46 (quoting *Ray v. Queen,* 747 A.2d 1137, 1141–42 (D.C.2000)). Although "[w]hat constitutes the accrual of a cause of action is a question of law . . .[,] when accrual actually occurred in a particular case is a question of fact" to be resolved by the factfinder. *See Diamond, supra* note 11, 680 A.2d at 370 (internal citations omitted). "In all cases to which the discovery rule applies, the inquiry is highly fact-bound and requires an evaluation of all of the plaintiff's circumstances." *Id.* at 372. Otherwise put, "[u]nless the evidence regarding the commencement of the running of the statute of limitations is so clear that the court can rule on the issue as a matter of law, the jury should decide the issue on appropriate instructions." *Lively v. Flexible Packaging Ass'n,* 830 A.2d 874, 892 n. 29 (D.C.2003) (en banc).[17]

### B.

Case law here and elsewhere supports the above analysis. While no case in our jurisdiction is squarely on point in addressing the medical knowledge required of a plaintiff to begin the running of the statute of limitations, a somewhat similar set of circumstances was involved in *Hendel, supra* note 11. In that case, the plaintiff brought an action against the defendants who taught courses in transcendental meditation (TM) and with whom the plaintiff had been involved for many years. Applying the discovery rule, we held that the plaintiff was on notice of the causal connection between TM and her various maladies because, more than three years prior to the filing of the action, she had consulted a series of health professionals who linked her condition to the activities of the defendant. The disagreement between the majority and the dissent was not the importance of the health professionals having informed the plaintiff of this linkage in order to commence the running of the statute of limitations but rather whether the evidence was undisputed that they had in fact done so.

17. A number of states, though adopting differing versions of the discovery rule, adhere to the principle that when a plaintiff's knowledge or the reasonableness of his actions are in dispute in light of the conflicting evidence, the determination whether the limitations defense is applicable is an issue best left to the jury. *See, e.g., John's Heating Serv. v. Lamb,* 46 P.3d 1024, 1031 (Alaska 2002); *Martin v. Arthur,* 339 Ark. 149, 3 S.W.3d 684, 689 (1999); *Collins v. Pittsburgh Corning Corp. (In re Asbestos Litig.),* 673 A.2d 159, 163 (Del. 1996); *Martin v. A & M Insulation Co.,* 207 Ill.App.3d 706, 152 Ill.Dec. 688, 566 N.E.2d 375, 379 (1990); *Degussa Corp. v. Mullens,* 744 N.E.2d 407, 410–11 (Ind.2001); *Gilger v. Lee Constr.,* 249 Kan. 307, 820 P.2d 390, 397 (1991), *superseded by statute on other grounds,* K.S.A. § 60–513(b) (2005), *as recognized in Klose by Klose v. Wood Valley Racquet Club, Inc.,* 267 Kan. 164, 975 P.2d 1218, 1222 (1999); *Lipsteuer v. CSX Transp., Inc.,* 37 S.W.3d 732, 737 (Ky.2000); *Pennwalt Corp. v. Nasios,* 314 Md. 433, 550 A.2d 1155, 1164 (1988); *Cannon v. Mid–South X–Ray Co.,* 738 So.2d 274, 276 (Miss.App.1999); *Nelson v. Nelson,* 310 Mont. 329, 50 P.3d 139, 144 (2002); *Oak Grove Investors v. Bell & Gossett Co.,* 99 Nev. 616, 668 P.2d 1075, 1078–79 (1983); *Schanilec v. Grand Forks Clinic, Ltd.,* 599 N.W.2d 253, 258 (N.D.1999); *Stephens v. Bohlman,* 314 Or. 344, 838 P.2d 600, 604 (1992); *Baumgart v. Keene Bldg. Prods. Corp.,* 542 Pa. 194, 666 A.2d 238, 243–244 (1995); *Benner v. J.H. Lynch & Sons,* 641 A.2d 332, 335 (R.I.1994); *Pustejovsky v. Rapid–American Corp.,* 35 S.W.3d 643, 652 (Tex.2000); *Rodrigue v. VALCO Enters.,* 169 Vt. 539, 726 A.2d 61, 64 (1999); *Green v. A.P.C.,* 136 Wash.2d 87, 960 P.2d 912, 918 (1998); *McCoy v. Miller,* 213 W.Va. 161, 578 S.E.2d 355, 361 (2003).

Looking elsewhere, we find duplication of our approach in a number of comparable decisions from other jurisdictions, which squarely addressed the issue and which we deem persuasive. In each of these cases, the plaintiff harbored a significant suspicion that his or her injury resulted from the tortious acts of the defendant but did not bring suit until he or she had obtained medical evidence that established a plausible (or some similar standard short of a reasonable medical certainty) causal link between the injury and the defendant's acts. A notably similar case to ours is *Borello v. U.S. Oil Co.*, 130 Wis.2d 397, 388 N.W.2d 140 (1986). In *Borello*, plaintiff had the defendant install a furnace in her home in December 1977. Shortly thereafter, plaintiff began to notice rancid odors emanating from the furnace. She wrote to the defendant, complaining that the odors made her nose burn, gave her headaches, made her dizzy, and gave her chest pains. Although plaintiff suspected that the furnace might be the cause of her ailments, she also thought that some other cause might be responsible for her condition Shortly after the onset of her symptoms, plaintiff sought medical assistance from several physicians, telling each physician she consulted that she believed that the furnace was the cause of her maladies. Each physician, however, told plaintiff that her condition could not, with any degree of medical probability, be attributable to the furnace. In February 1979, plaintiff wrote another letter to the defendant and asked that it inspect her furnace. She wrote, "[I]f I continue to be ill from this furnace there will be a Court Case." *Id.* at 142. She was admitted to the hospital that same day. Upon returning home from the hospital in February 1979, plaintiff noticed that the floor of her home was covered with red dust. In October 1979, another physician examined plaintiff and concluded that, based upon the laboratory findings of the dust samples from plaintiff's home, her symptoms were caused by the furnace. Plaintiff filed her action within the requisite three years after that date.

In affirming the appellate court's reversal of the trial court's decision dismissing the complaint as untimely filed, the Supreme Court of Wisconsin adopted the reasoning in *Williams v. Borden, Inc.*, 637 F.2d 731 (10th Cir.1980) and concluded,

> A hunch or a belief that is not presently supportable does not constitute the kind of knowledge that charges a possible plaintiff with the immediate duty to commence an action. Only when there was some medical evidence of a probable link between the PVC fumes and her injuries was she charged with the duty to commence action within the period of limitations....

*Borello*, 388 N.W.2d at 146 n. 5.

> Thus we conclude that the statute of limitations did not commence to run against Borello's claim until she had a basis for objectively concluding that metal fume fever from a furnace installed by [the defendants] was probably the cause of her symptoms.

*Id.* at 147.

Another factually analogous case is *Vispisiano v. Ashland Chem. Co.*, 107 N.J. 416, 527 A.2d 66 (1987). There, the plaintiff was exposed to certain chemicals while employed with defendant from October 1977 to April 1978. In January 1978, plaintiff sought medical treatment for para-nasal congestion. The examining physician noted that plaintiff was exposed to chemicals at work. In March 1978, when plaintiff began to experience swelling in various parts of his body and broke out in rashes, he consulted another physician for treatment and a diagnosis of his conditions. The physician was unable to determine the cause of plaintiff's symptoms.

Shortly thereafter, plaintiff was rushed to the hospital, suffering from severe migraine headaches. Plaintiff's discharge papers from his stay at the hospital listed his diagnosis as "Headaches undetermined etiology." *Id.* at 69. After consulting other physicians, plaintiff visited a former co-worker, who was hospitalized, and learned that his friend was exhibiting symptoms similar to his own and that chemical exposure was the likely cause. Although plaintiff considered chemical exposure as a possible cause of his medical problems, his physicians were unable to come up with a diagnosis. Thus, plaintiff thought his problems came from other sources, *viz.*, food allergies, detergent, soap, or "men's problems." *Id.* As a result of his conversation with his co-worker, plaintiff called his physician and expressed concern that his problems might be due to chemical exposure. The physician, however, did not believe that chemical exposure was the source of plaintiff's problems, though he considered it a possibility. In the summer of 1981, plaintiff consulted an allergist, who "wouldn't rule out" chemical exposure as the cause of his symptoms but "checked into it" and consulted with another related physician.[18] *Id.* at 70. Plaintiff filed suit on March 12, 1982.

In these circumstances, the Supreme Court of New Jersey rejected the argument, adopted by the lower courts, that when the proofs demonstrate an "arousal" of a plaintiff's "suspicions" [of a causal connection,] the cause of action accrues. *Id.* at 75. Rather, the court adopted as a guiding principle in this toxic tort case "the necessity for reasonable medical information before a plaintiff may be deemed to have the requisite knowledge

for accrual of a toxic tort cause of action." *Id.* at 76. The court ultimately concluded:

Given our requirement that before a toxic tort case plaintiff may be deemed in a discovery rule context to have the requisite state of knowledge that would trigger the running of the statute of limitations, his impression of the nature of the injury and of its cause must have some reasonable medical support, we are convinced that defendants were not entitled to summary judgment. We hasten to add that we do not insist on medical confirmation as such: a physician's willingness to include chemical poisoning in the differential diagnosis would probably suffice, as would any other reasonably reliable source of information.

Here, however, Dr. Thurston's responses through March 13, 1980 [19] were so equivocal as to lead only to the conclusion that no medical explanation could reasonably account for plaintiff's difficulties.

*Id.* at 77.

A more recent case reflecting the same approach is *Degussa Corp. v. Mullens*, 744 N.E.2d 407 (Ind.2001). In *Degussa*, plaintiff brought a negligence and products liability action against the defendant for lung damage caused by exposure to various chemicals while working at an animal feed company where she mixed various powdered and liquid ingredients. After plaintiff began working for the defendant in September 1990, she developed a persistent cough that would improve when she went home in the evenings and on weekends. In March 1991, plaintiff went to the emergency room for treatment of bronchi-

---

18. This physician ultimately related plaintiff's condition to toxic chemical exposure in August 1982.

19. This date was two years prior to the filing of the action. A two-year statute of limitations was applicable to this action under New Jersey law.

tis. Her bronchitis went away, but her cough continued. In February 1992, she experienced severe coughing and shortness of breath at work. Plaintiff went to the emergency room again, was told that she had bronchitis, and received a prescription for antibiotics. When the antibiotics did not work, plaintiff consulted her family physician on March 17, 1992, who diagnosed plaintiff as having bronchitis. The doctor also told plaintiff that "it was possible that her coughing and breathing problems were work-related, but that there were several other potential causes." *Id.* at 409. The doctor advised that she needed to further investigate the cause of her maladies. Plaintiff consulted other specialists over the next several years. In March 1994, plaintiff received the first unequivocal statement from any doctor that her lung disease was caused by exposure to chemicals consistent with those used at her place of employment. Plaintiff filed suit on March 25, 1994. *Id.*

The Supreme Court of Indiana reversed the intermediate appellate court's grant of summary judgment. The court articulated the controlling principle as follows:

Once a plaintiff's doctor expressly informs the plaintiff that there is a "reasonable possibility, if not a probability" that an injury was caused by an act or product, then the statute of limitations begins to run.... When a doctor so informs a potential plaintiff, the plaintiff is deemed to have sufficient information such that he or she should promptly seek "additional medical or legal advice needed to resolve any remaining uncertainty or confusion" regarding the cause of his or her injuries, and therefore be able to file a claim within two years of being informed of a reasonable possible or likely cause.... Although "events short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's" product

caused his or her injuries, a plaintiff's mere suspicion or speculation that another's product caused the injuries is insufficient to trigger the statute.... Circumstances where a physician tells a patient that a product or act is one of several "possible" causes of an injury present a complex of factually and legally relevant questions about how the physician conveyed the information to the patient and what emphasis the physician placed on the potentially tortious cause of over causes.

*Id.* at 411. Viewing the record before it, the court said that when the plaintiff first visited Dr. Watkins on March 17, 1992, "the best that Dr. Watkins could do to respond to her concern was to emphasize that there were a range of potential causes" and that

we see nothing in the record to indicate that on March 17, 1992 (or even in the following eight days that would have been outside of the statutory period), Mullen's physician had yet informed her that there was a reasonable possibility, if not probability, that her ailments were caused by work chemicals.

*Id.*

Finally, in a case closer to home, *Helinski v. Appleton Papers*, 952 F.Supp. 266 (D.Md.1997), a federal district court applied Maryland law in denying a motion for summary judgment based on the three-year statute of limitations. The Maryland plaintiff's health complaints began in 1989 coinciding with the onset of renovation of her office. She consulted with a series of physicians who posited a variety of potential causes, including obesity, stress and reactions to makeup. By late 1990, the plaintiff was convinced that her symptoms were work-related, but it was not until mid–1991 that she was first told by physicians that exposure to the defendant's

product (carbonless copy paper—CCP) could be the cause of at least the dermatological symptoms she was experiencing. By 1992, after discussions with occupational health specialists, the plaintiff began to suspect that she was suffering from chemical hypersensitivity brought on by exposure to toxic substances in the workplace. She conducted her own research on the subject, which led her to file suit on November 15, 1993.

As to causation, the court noted that the statute began to run when the plaintiff knew or should know that "the injury was probably caused by the defendant" but that "clear and unequivocal proof" of manufacturer wrongdoing or a product defect is not required; rather, express or implied knowledge of each element is sufficient to trigger the limitations period. *Id.* at 269 (citations omitted). However, a plaintiff's mere suspicions are not sufficient. *Id.* (citations omitted). Here, the defendants asserted that the statute began to run in 1989 because plaintiff at that time brought along CCP forms to the physician's visit in an effort to determine whether they could be causing at least some of her problems. The trial court rejected this argument because while plaintiff undertook an investigation once she was injured, she asserted that she could not obtain the information necessary to make a causal connection between CCP and her injuries until she was told by physicians in mid–1991 that CCP could be the cause of at least her dermatological injuries.

The court recognized, however, the merit in the defendants' argument that waiting to commence the limitation period until a plaintiff receives conclusive evidence of causation would go too far. It noted the particular difficulty in this case, as many, where it was disputed whether any causal link existed between CCP and the plaintiff's ailment. Most courts, it concluded, have adopted a rule "that the limitations period is triggered when a plaintiff is on notice that a substance has likely caused her injury." *Id.* at 271. Rather than requiring conclusive proof of causation, "a physician's opinion regarding causation puts a plaintiff on notice if it is not 'neutral, ambiguous, hypothetical or phrased in terms of mere possibility.'" *Id.* (citing and quoting *Fidler v. Eastman Kodak Co.*, 714 F.2d 192, 200 (1st Cir.1983)).

The *Helinski* court also cited to a similar holding in *Dawson, supra* note 12, 543 F.Supp. at 1334, where the court rejected the plaintiff's claim that "clear and certain knowledge" of causation was required. *Helinski*, 952 F.Supp. at 272. The *Dawson* court stated that "if the statute of limitations did not begin to run merely because a plaintiff who knew of a possible causal relationship and did not rely on any representations to the contrary did not have certain knowledge of causation, no claim where causation could be disputed would ever accrue." *Dawson, supra* note 12, 543 F.Supp. at 1334.[20]

**20.** Expanding upon the point, the *Helinski* court stated:

Allowing a plaintiff to wait until she possesses clear evidence of causation would do violence to one of the purposes of statutes of limitations, to "grant repose to defendants when plaintiffs have tarried for an unreasonable period of time." [citations omitted]. Of course, this interest in repose has its limits. . . . With regard to causation, however, less need exists for solicitude toward plaintiffs. If a plaintiff cannot marshal sufficient evidence to prove causation, her claim may simply be inherently weak, and there is no reason why the limitations period should not commence. [citations omitted]. As in *Fidler*, this is not a situation in which scientific understanding has advanced since the causal link between CCP and health complaints was first suggested to Helinski. To allow a plaintiff to postpone the running of the limitations pe-

Reviewing these authorities, the court concluded:

Defendants' point is therefore well-taken, to the extent Helinski argues that knowledge of causation was not established until she had clear evidence from an expert that CCP was causing her health problems. [The cases] do not require such a strong causal connection. Defendants' further contention, however, that the statute of limitations was triggered by Helinski's mere suspicions of a causal connection, goes too far the other way. Based on the contradictory and inconclusive diagnoses Helinski received from 1989 until 1991 [which were not in dispute], I find that Helinski had knowledge of the probable cause of her injury in May of 1991 at the earliest, when physicians first suggested that CCP could be causing some of her symptoms. Before 1991, while no physician ruled out CCP as a cause, nobody provided Helinski with information making CCP a probable, rather than a possible, cause of her illness.

*Id.* at 272.[21]

## C.

■■■■ We turn now to an examination of the application of these principles to the case before us. As already noted, see note 2, *supra*, the trial court's approach was hampered by its belief that the question of the application of the statute of limitations was one involving "subject mat-ter jurisdiction." Case law is quite to the contrary.

Normally, a statute of limitations erects no jurisdictional bar.... Rather, as we have held, [t]he statute of limitations is an affirmative defense which, under [Super. Ct. Civ. R.] 8(c) must be set forth affirmatively in a responsive pleading, and may be waived if not promptly pleaded.... Assuming a trial court may raise the limitations issue *sua sponte*, it should not do so unless, at a minimum, the expiration of the statute is clear from the face of [the] complaint.

*Feldman v. Gogos*, 628 A.2d 103, 104–05 (D.C.1993) (internal quotations, citations and footnote omitted). Furthermore, as already noted, even when properly raised in the pleadings, as here, "[w]hat constitutes the accrual of a cause of action is a question of law; the actual date of accrual, however, is a question of fact." *Cevenini, supra* note 11, 707 A.2d at 770–71 (citations omitted). As an affirmative defense, the burden of proof is on the defendant unless the claim is barred on its face. *Oparaugo v. Watts*, 884 A.2d 63, 73 (D.C. 2005) (citation omitted). Thus, in a jury case, it is for the jury to resolve any disputed facts relevant to the determination of the accrual of the statute of limitations. Included in the possible disputed facts is the reasonableness of the plaintiff's actions or inactions in light of what may be otherwise undisputed basic facts. "What is 'reasonable under the circumstances' is a

riod indefinitely in the hopes of a breakthrough in medical understanding would extend a defendant's potential liability for "defects" that at the time a product was manufactured were not discernible by anyone. Such a result does not just tip the balance against repose, but entirely eliminates it in some circumstances. *Helinski*, 952 F.Supp. at 272 n. 3.

**21.** *See also, e.g., Brown v. E.I. DuPont de Nemours & Co.*, 820 A.2d 362 (Del.2003);

*Martin, supra* note 17, 207 Ill.App.3d 706, 152 Ill.Dec. 688, 566 N.E.2d 375; *Pennwalt Corp., supra* note 17, 314 Md. 433, 550 A.2d 1155; *Schiro v. American Tobacco Co.*, 611 So.2d 962 (Miss.1992); *Owens–Illinois, Inc. v. Edwards*, 573 So.2d 704 (Miss.1990); *Cannon, supra* note 17, 738 So.2d 274; *Childs v. Haussecker*, 974 S.W.2d 31 (Tex.1998); 2 JAMES T. O'REILLY, TOXIC TORTS PRACTICE GUIDE § 26:7 (2d ed. 2005).

highly factual analysis." *Diamond, supra* note 11, 680 A.2d at 372. "[W]e have held that summary judgment is improper when there is a disputed question about plaintiff's diligence in investigating a possible cause of action...." *Doe, supra,* 814 A.2d at 946 (citation omitted). It is proper for a trial court in a jury case to rule on the application of the statute of limitations only if it determines that, viewing the facts in the light most favorable to the plaintiff, no reasonable jury could find that the statute of limitations did not bar the action and thus, under the oft-stated and well-established standards for the entry of summary judgment, enter summary judgment for the defendant properly raising the bar of the statute of limitations.

SEW contends that although the trial judge used the terms "jurisdiction" and "jurisdictional kind of facts" in concluding that Brin's action was time-barred, the trial judge made no improper determinations of fact in making her determination and that we should affirm as a proper grant of summary judgment on the ground that, as a matter of law, Brin knew or should have known she had a cause of action more than three years before she filed suit. *See Cevenini, supra* note 11, 707 A.2d at 770.

If the question of the application of the statute of limitations was one of "jurisdiction," the trial court would have quite properly resolved disputed questions of fact. *See Matthews v. Automated Bus. Sys. & Servs., Inc.,* 558 A.2d 1175, 1179 (D.C.1989). With its mind set of ruling on a question of "jurisdiction," it is not entirely clear to us that the trial court relied solely on undisputed facts. Reference is made at a number of points to "inferences." In any event, as we read its ruling, the trial court basically rested on the proposition that Brin had or should have had knowledge of the causal link between her maladies and the air quality, citing for example Brin's letter to the EPA as an early indication of such knowledge.

In our minds, however, the problems with a grant of summary judgment on the current record are at least threefold. First, in its analysis of the record, while documenting Brin's suspicions of the air quality, the trial court discounted the need, as we have held here, for some medical evidence that tended to confirm that suspicion. Even with her suspicions, Brin herself saw other possible causes for her various ailments. A critical question was when she received the first medical advice that the bad air was a plausible (reasonably possible) cause of her maladies. Second, the trial court faulted Brin for not delving more vigorously into the litigation described in *Bahura.* But Brin explained why she did not make an effort to join the case although she acknowledged that she had heard "whispers" that a lawsuit had been filed.

> Well I guess it didn't seem relevant to me at all. I mean to the degree that I knew anything that was happening to those people, it all seemed like they were having allergy problems. The person that I saw who collapsed was having trouble breathing. That didn't seem relevant to anything that was happening in my life at all, plus the first whispers that I heard about a case, I mean I wasn't even sick. I had had [sic] hives when I first got there, which was something that went away after a period of time.

While it could very well be thought that Brin should have been more aggressive in attempting to learn about the *Bahura* litigation, we might be somewhat hesitant to say that in light of this statement and other circumstances of the case, the court should have made the determination of whether Brin had acted with "reasonable diligence." As previously discussed, that

factual issue is almost always a jury question. Third, and perhaps most importantly, even assuming Brin had the duty to investigate further into *Bahura,* it is not readily apparent from the record before us what she would have discovered that would have provided her with the requisite medically supported link between her particular medical condition and the air quality. To establish this by undisputed evidence was of course the burden of SEW in seeking summary judgment based on the defense of the statute of limitations.

On the other hand, we could hardly say that the fact (if true) that Brin did not receive a medical opinion that, "to a reasonable degree of medical certainty," the air quality was a cause of her condition until the receipt of Dr. Balbus' report in September 1998, is conclusive of the statute of limitations issue. As indicated above, no such heightened degree of certainty is required for the statute of limitations to begin to run. The record is simply inadequate to determine exactly what Brin had previously been told about the plausibility of a linkage between her condition and the air quality. Indeed, it is not clear precisely how much Brin told her doctors about her suspicions or the factual basis therefor. It may well be that a jury (or the trial court as a matter of law) could be convinced that Brin had the duty to inquire further into the *Bahura* litigation and that had she done so, she could have developed factual material that could be presented to the doctors at an earlier time and affected their view of the linkage question.[22] In short, while we reverse the trial judge's judgment in favor of SEW, the statute of limitations issue very much remains in the case as an issue on remand.[23]

For the foregoing reasons, the trial court's entry of judgment for SEW is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

22. We note that it appears that such material from the prior litigation, which Brin finally obtained, was relevant to Dr. Balbus' determination in September 1998.

23. Brin argues that even if the statute of limitations would otherwise have run, it was tolled by the fact that she was non compos mentis during a portion of the relevant time. While this possibly could develop into an issue, it is not relevant to this appeal, given our ruling on the causation issue itself.